Raymond WRAY, Petitioner–Appellant,

v.

Sally B. JOHNSON, Superintendent, Orleans Correctional Facility, Respondent–Appellee.

Docket No. 98–2680

United States Court of Appeals, Second Circuit.

Argued: April 20, 1999

Decided: Feb. 2, 2000

Dawn M. Cardi, New York, New York (Robert Rosenthal, New York, New York, on the brief), for Petitioner–Appellant.

Robin A. Forshaw, Assistant District Attorney, Kew Gardens, New York (Richard A. Brown, District Attorney for Queens County, John M. Castellano, Assistant District Attorney, Kew Gardens, New York, on the brief), for Respondent–Appellee.

Before: KEARSE, McLAUGHLIN, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner Raymond Wray, a New York State ("State") prisoner convicted of robbery and weapons offenses, appeals from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge,* dismissing his petition pursuant to 28 U.S.C. § 2254 (1994 & Supp. III 1997) for a writ of habeas corpus alleging that Wray was denied due process when the state trial court improperly admitted evidence of a witness's out-of-court showup identification of him. The district court denied the petition, ruling that, although the admission of the showup evidence constituted a due process violation, the error was harmless. Wray challenges this ruling on appeal. For the reasons that follow, we conclude that the error was not harmless, and we therefore reverse and remand for the conditional granting of the writ.

## I. BACKGROUND

Shortly after midnight on November 25, 1990, on Merrick Boulevard in Queens County, New York, near a West Indian restaurant ("Bea's Kitchen" or "Bea's"), Melvin Mitchell, accompanied by his friend Craig Williams, was robbed of his leather jacket. The robbery was witnessed by New York City Police Officers Daniel Martorano and William Weller; two persons, including Wray, were quickly arrested. Wray was eventually indicted on two counts of first degree robbery and two counts of criminal possession of a weapon.

Mitchell, Williams, Martorano, and Weller testified at trial about the robbery. Their versions of the event were consistent to the extent they testified that one of the robbers, dressed in a long black coat and a black hat, confronted Mitchell with a gun, and that there was at least one accomplice who stood behind Mitchell while the gunman demanded and received Mitchell's jacket. That accomplice was later identified as one Dennis Bailey. The principal question at trial was the identity of the gunman. The officers testified that the gunman was Wray; Mitchell and Williams testified that the gunman was not Wray.

**518**

A. *The Robbery*

When the robbery occurred, Martorano, Weller, and Sergeant James McCavera, plainclothes police officers who were assigned to an anticrime unit, were positioned on the roof of a supermarket building on the north side of Merrick Boulevard, directly across the street from Bea's Kitchen, conducting a surveillance of that establishment and persons approaching it. Only Martorano and Weller observed the robbery. The area was fairly well-illuminated by two overhead streetlights and lights from a gas station on the south side of Merrick Boulevard, two stores to the east. The supermarket building was one-story high, its roof approximately 15 feet above street level, and was approximately 100 feet from Bea's. The officers had no "binoculars or any other magnifying or seeing devices" (Trial Transcript ("Tr.") 355).

1. *Officer Martorano's Version of the Events*

Martorano testified that he was watching the front door of Bea's Kitchen and saw a number of persons standing outside, including one wearing a long black coat and a black hat (to whom we shall refer as "LongBlackCoat" or the "gunman") and one eventually identified as Bailey, wearing a green jacket. Most of those persons entered the restaurant; LongBlackCoat and Bailey remained outside. Martorano then noticed two other persons (Mitchell and Williams) walking away from Bea's Kitchen, proceeding west on Merrick Boulevard. Martorano testified that LongBlackCoat followed Mitchell and Williams and overtook them:

> At this time I saw one individual with the long black coat step in front, blocking these two people's path. I then noted that this person had a gun. He was holding it to his—close to his waist.

Q. Who had the gun?

A. The person with the long black coat.

Q. And where was that—where was he holding the gun?

A. He was holding it close to his waist, kind of close to his body. The other individual with the green corduroy jacket was standing behind the two people I noted walking away from the front door.

. . . .

Q. . . . . What did you see happen next?

A. I then saw one person who was—one of the people who were walking away from the door remove his jacket and hand it to the person with the long black coat who was holding the gun.

At this time I saw two individuals continue to walk towards 234th Street, and the person with the long black coat and the other individual with the green jacket walked back towards Bea's Kitchen.

(Tr. 321–22.)

Q. . . . . Now, when you're making these observations, are you using anything to aid you in these observations?

A. No, I'm not.

Q. And can you describe for us, as you remember, back on November 25th of 1990 the face of Raymond Wray?

A. What I can make out of his face, very dark skinned and he had like a goatee, mustache. That was—that's all I can describe of his face.

Q. And now can you describe the black hat that you saw him with?

A. Just as far as I remember, just a black hat. It was—I believe it had a brim on it.

Q. And can you describe the black coat that you saw him wear?

A. Yeah. It was a long black coat. It looked like—it was like a padded-type coat, very heavy winter coat. It was called what they call three-quarter

length. It come [*sic*] down to your calves, almost to your ankles.

(Tr. 326.)

Martorano testified that the incident occurred approximately one storefront away from Bea's Kitchen and took about 20 seconds. He observed that as Mitchell and Williams walked away, the two robbers returned toward the restaurant. The gunman handed Mitchell's jacket through the doorway of the restaurant and gave the gun to Bailey, who remained outside; the gunman then entered the restaurant. During these events, Martorano had not noticed anyone other than Mitchell, Williams, and the two robbers on the street.

### 2. *Officer Weller's Version of the Events*

Weller too had watched a group in front of Bea's Kitchen disperse until only two were left. One of the men was Bailey; the other, LongBlackCoat, "was wearing a black hat, he was wearing a full length overcoat type raincoat winter jacket and he had some kind of dark shirt underneath." (Tr. 475.) Weller saw another person (later identified as Mitchell) leave Bea's and walk westward. Weller watched as LongBlackCoat and Bailey began to follow Mitchell.

Q. And tell us what you saw.

A. I observed them catch up to the individual. He became known to me as Melvin Mitchell. The one individual, Raymond Wray, stepped to the front of him as if facing him. The other individual, Dennis Bailey, stepped around to the back of Melvin Mitchell. At this point Melvin Mitchell's back was to me as was Dennis Bailey's, and Raymond Wray was actually facing me.

(Tr. 476–77.) Weller noticed that Wray had a gun pointed at Mitchell and saw Mitchell take off his leather jacket and hand it to Wray.

Weller did not see Williams during the robbery. Although Weller had at some point noticed one person cross to the north side of Merrick Boulevard, he was sure that only three persons—two robbers and one victim—were present at the robbery.

Weller described the gunman as "kind of dark skinned and he had some type of growth, hair around his chin area." (Tr. 475.) Asked whether he could recall anything more about the robbers' faces, Weller stated, "It was a little tough to see, the actual make up of the face. It was dark out and it was shadows." (*Id.*)

### 3. *Williams's Version of the Events*

According to Williams, he, Mitchell, and two friends had gone to Bea's Kitchen that night to get something to eat. When they arrived, a doorman and three other men were in front, and Mitchell and his friends learned that the restaurant was hosting a private party and they would have to pay an admission fee to enter. After a five-minute discussion with the doorman, the Mitchell group decided against paying the entry fee and began to walk west toward where they had parked. Some three minutes into their conversation with the doorman, the other three men initially in front of Bea's had left and gone westward on Merrick Boulevard. When Mitchell, Williams, and their two friends left and were approximately three storefronts west of Bea's Kitchen, those three men approached them from the west, one of them displaying a gun. Williams described the gunman as dark-skinned, heavy-set, weighing at least 200 pounds, having "a little mustache, a little beard" (Tr. 179), and wearing a long, black, insulated trench coat and a black hat with a brim and a feather.

Two members of Mitchell's group promptly fled, leaving Mitchell and Williams on the scene. The gunman, who had a West Indian accent, confronted Mitchell and demanded his jacket; the other two assailants positioned themselves behind Mitchell and Williams. Williams testified that although he and Mitchell were not facing Bea's Kitchen during the

robbery (Mitchell's back and Williams's side were toward the restaurant), after the gunman took Mitchell's coat and walked past them toward Bea's, Williams and Mitchell turned to see where the robbers were going. The gunman told them to back up; they did so and watched all three robbers go into the restaurant.

### 4. *Mitchell's Version of the Events*

Mitchell testified that he and his three companions had gone to Bea's Kitchen to get something to eat but had not entered because they were informed by the doorman—who Mitchell said was the only person in front of Bea's—that they would have to pay to be admitted. When they decided not to pay the admission charge, the four friends began to walk toward Mitchell's car. Approximately two storefronts from Bea's, they were accosted by three men who came up behind them and said, "Hey," causing Mitchell and his friends to turn around. One of the assailants pulled a gun, and one of Mitchell's friends immediately fled, leaving Mitchell, Williams, and the other friend, "Patrick." The gunman faced Mitchell, Williams, and Patrick, all of whom were present throughout the robbery; the other two assailants stood behind or to the side of Mitchell and his friends. Mitchell described the gunman as brown-skinned and having a round face with no facial hair that Mitchell could recall; he was about Mitchell's height, 5'7", and was a bit chubby; he wore a thick black trench coat and a round black hat, and he spoke with a West Indian accent. One of the other assailants stood close behind Mitchell, who was unable to describe him except to say that he was a little taller than Mitchell.

Mitchell was positive that the robbers approached them from behind and that he and his friends turned around and were facing Bea's Kitchen during and immediately after the robbery. After Mitchell had given up his coat, the gunman ordered Mitchell and his two friends to back up and keep walking, and they did so. While backing up, Mitchell saw all three robbers go into Bea's.

### B. *The Arrests, the Showups, and the* Wade *Hearing*

After Martorano and Weller saw Mitchell hand his jacket to the gunman, Weller and McCavera promptly left the rooftop to go to Bea's Kitchen; Martorano remained on the roof and, by radio, called for backup officers and reported to Weller his current observations as to the robbers' whereabouts. He informed Weller that the gunman had entered Bea's Kitchen, and that Bailey had been handed the gun used in the robbery and was walking west on Merrick Boulevard. Weller and McCavera intercepted Bailey and placed him under arrest, seizing the gun.

As Weller and McCavera were arresting Bailey, Martorano saw the gunman take two or three steps out of Bea's Kitchen and observe the officers' apprehension of Bailey. The gunman "[a]t this point . . . turned and ran back into the front door of Bea's Kitchen." (Tr. 331.) Martorano radioed this information to Weller. Weller took a quick look inside the restaurant but closed the door and did not enter until he checked to see that he had backup. He and McCavera then entered the restaurant, along with a uniformed officer whom they stationed at the door to ensure that no one on the premises left prematurely.

The main floor of the restaurant had a fairly well-lit "primary room" (Tr. 521), into which the front door opened, and a dark second large room from which music was emanating. According to Weller, there were at most 30 persons in the restaurant; according to McCavera, there were 75–100. Neither officer saw there any white persons. The officers did not immediately see the gunman. They searched for him unsuccessfully in a back office and in a dark basement; while in the basement, they found Mitchell's jacket behind a counter. The officers then returned to the main floor and went directly to the secondary room, which was "com-

pletely black." (Tr. 491.) Weller ordered the lights turned on and then saw some 15–20 people in that room, but saw no one wearing a long black coat. The officers then went to the well-lit primary room, where there were 10–12 people; there Weller spotted Wray standing on a raised platform, wearing a black hat and a full-length black trench coat. Both Weller and McCavera testified that no one else was dressed that way. McCavera did not recall anyone else wearing an outer coat. The officers promptly placed Wray under arrest. They were inside Bea's Kitchen for at most 4–5 minutes, and apparently made no search to see whether there were any other long black coats on the premises.

Shortly thereafter, Mitchell, having learned that there was police activity at Bea's Kitchen, returned and saw Martorano holding his jacket. Mitchell informed Martorano that that was his jacket; Martorano told Mitchell that the police had two people under arrest, and he asked Mitchell to go to the precinct.

The events at the precinct, within hours after the robbery, were described by Martorano, Mitchell, and Williams at a *Wade* hearing, *see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), held during the trial, just after the opening statements had been made and prior to the presentation of evidence. At the *Wade* hearing, Martorano testified that Wray and Bailey had been placed in a cell, with Wray wearing his black hat and long black coat. Martorano "asked Mr. Mitchell to look into the cell" (Tr. 69), and "asked him if he recognized Mr. Wray" (Tr. 70).

> Q. And how did Mr. Mitchell know who you were referring to?
> A. I pointed to Mr. Wray.
> . . . .
> He told me that Mr. Wray was the person who had the gun who took his coat.

(*Id.*)

Mitchell testified at the *Wade* hearing that Wray was the only person he was shown at the precinct. However, he had recognized the person he was shown not as the gunman, but rather as one of the persons who had stood behind Mitchell during the robbery. Mitchell testified that he did not so inform the police because they never asked him whether Wray was the one with the gun.

Williams too went to the precinct following the arrests of Wray and Bailey, and was asked to make an identification, by an officer whose name he thought "start[ed] with a W. Wellie (phonetic)" (Tr. 108), or "something like" "Weller" (Tr. 109). At the *Wade* hearing Williams testified that

> [a]t the precinct, the officer asked me to tell me [*sic*] that he had the person that robbed Melvin and take a look in the . . . window [in the door of the jail cell], to see if that's him.

(Tr. 100.) Williams saw one person in the cell, wearing a black hat with a brim and a feather and a long lined trench coat. He saw the man only in profile and told the police that person was the gunman, because "[f]rom the side view it looked just like the guy who had the gun, plus he had the same clothes on that he had on at the time he robbed us." (Tr. 105.)

Williams also testified at the *Wade* hearing that during the robbery he had recognized the faces of all three of the robbers because he had seen them around the neighborhood prior to November 25, 1990. (Tr. 103) He had seen the gunman two or three times prior to the robbery (Tr. 99), and he had thought the person he identified at the precinct was the gunman (Tr. 105). He testified that he had never seen Wray, however, prior to the *Wade* hearing. (Tr. 107.)

At the conclusion of the *Wade* hearing, the trial court suppressed Mitchell's prior identification of Wray on the ground that the showup procedure was improperly suggestive. However, the court ruled that Mitchell had an independent basis for

recognizing Wray and would therefore be allowed to make an in-court identification at trial. The court ruled that Williams would be allowed not only to make an in-court identification, but also to testify to his identification of Wray at the precinct.

## C. *The Trial*

At trial, Martorano, Weller, Mitchell, and Williams gave their respective versions of the robbery, as described in Part I.A. above. Martorano and Weller identified Wray as the gunman they had seen on November 25, 1990, taking Mitchell's jacket. Martorano testified that there was "no doubt in [his] mind" that Wray was the gunman. (Tr. 401.) Weller testified that he was "[a]bsolutely" convinced that Wray was the gunman. (Tr. 506.) Though the officers had seized from Bailey the gun handed him by the gunman, the officers never had the gun tested for Wray's fingerprints.

Mitchell and Williams testified unequivocally at trial that Wray in fact was not the gunman. Mitchell testified that the gunman wore "the same type of coat and hat that Wray had on" (Tr. 301), "but he didn't look like Mr. Wray" (Tr. 288), and Wray "didn't have the gun" (Tr. 301). Mitchell "th[ought]" Wray was one of the robbers who stood behind him (Tr. 252), although he "d[id]n't really know" (Tr. 251) and was "not sure" (Tr. 262). Mitchell was unable to describe the other robbers except to say that the one who stood closest behind him was

> a little taller than me and not that much taller than me but he was tall, and I didn't really, really pay too much attention to the person beside me. The only thing I was thinking about was running but I couldn't, but I was basically just paying attention to the person in front of me with the gun. My life was in jeopardy.

(Tr. 254.) Mitchell testified that he did not recall that any of the robbers other than the gunman had worn a long black coat or a hat. (Tr. 254–55.) When asked by the prosecutor "what makes you unsure as to whether or not the defendant in court was present at the robbery" (Tr. 300), Mitchell testified as follows:

A. Time change.[*sic*] People change.

Q. Well, do you notice a change in his appearance today as opposed to how you remember him appearing on November 25, 1990?

A. His hair wasn't like that. When I saw him he had a hat on and I don't think he had facial hair or not.

Q. When you saw him on November 25th of 1990 he had a hat on?

A. Yes.

Q. So you didn't see his hair?

A. No.

Q. Okay. What color hat did he have on?

A. A black round hat.

Q. And what color coat was he wearing?

A. A long trench coat.

Q. And is he the individual that pointed the gun at you?

A. No.

Q. You're sure of that, though, right?

A. Yes.

(Tr. 300–01.)

Williams testified unqualifiedly not only that Wray was not the gunman, but also that Wray was not one of the other robbers. He testified that at the precinct he was shown a suspect standing in a cell or small room, wearing a coat and hat with a feather, and was asked whether the suspect was one of the robbers. Williams testified that at the precinct he had informed the police officer that the suspect was the gunman. He testified that he had assumed that the police officers had arrested the right man because he knew they had found Mitchell's jacket and the robber's gun.

Williams also testified that he was not sure that Wray was the suspect he had been shown at the precinct:

Q. When you got to the precinct, ... you did see one person who was arrested, right?

A. Yes.

Q. And that was Mr. Wray. You saw him in the precinct, did you not?

A. I guess so. I don't know who.

(Tr. 231.)

Q. Do you recognize the person in court today as the person you saw at the precinct?

A. I don't know.

(Tr. 245.) Williams said that at the precinct he had seen the suspect only in profile: "I saw him from the side. I didn't see him from the front. I didn't see the face features." (Tr. 205.) When shown, at trial, photographs of Wray that had been taken immediately after the arrest, Williams testified that they looked "somewhat" like the suspect he had seen at the precinct (Tr. 204, 205), and that he "guess[ed]" the photos depicted the man he had seen at the precinct (Tr. 206). But he testified that the man in the photos was not one of the robbers.

Wray testified in his own defense. He denied any involvement in the robbery. He said he had arrived at Bea's Kitchen at about 10:30 p.m. for the party and never left; he was wearing his coat and hat because it was cold inside. Wray also called two other defense witnesses, one of whom was a friend who testified that he did not see Wray leave the restaurant that night. The other was the proprietor of Bea's Kitchen, who testified that there were some 40–50 people at the restaurant that night and that it was basically a West Indian crowd.

In summation, the prosecutor urged the jury to reject Williams's trial testimony that Wray was not one of the assailants and to trust instead his identification of Wray at the precinct:

We know from Craig Williams that he was—he said he was there when the robbery happened, that *he went back to the 105 Precinct* after the robbery and that *at that time he looked at someone and he told the police officers that was the person who had the gun .... [H]e saw the profile of the face at the precinct and he said that person is the person who had the gun.*

Now, *when he came to court and he said I don't recognize the defendant,* and he looked at the photographs and said I don't recognize the person in the photographs ... *I submit to you that what has happened over the year and a half is that Craig Williams might have forgotten exactly what the gunman looked like* ....

We know from the police officers that the pictures of the defendant ... were taken when he was at the precinct and we know from the police officers that they arrested two people this night, only one had the black hat, the long black coat and that was the defendant....

*So we know, if you listened to Craig Williams' testimony of the person he saw at the precinct,* and you listen and think about what Officer Martorano and Officer Weller told you about the two people they arrested, *that Craig Williams had to have identified the defendant back on November 25th of 1990 because it's the only one of the two people who were arrested that fit the description that Mr. Williams gave you of the person that he recognized back then,* and I don't think, Ladies and Gentlemen, that there is anything mysterious of someone's inability to remember one and a half years later the face of someone they saw a long time ago for a relatively short period of time, but if you put the testimony together of Mr. Williams' description and *what he said at the time, November 25th of 1990,* with the officer's description of who was arrested, *the only logical conclusion is that Mr. Williams identified the defendant as the one who had the gun.*

(Tr. 715–17 (emphases added).)

During its deliberations, the jury requested a rereading of " '[b]oth Mr.

Williams' and Mr. Mitchell's testimony as to what they saw at the precinct and their identification in court.'" (Tr. 771.) The jury found Wray guilty on all counts.

Wray appealed his conviction contending, *inter alia,* that the trial court erred in failing to exclude evidence of Williams's showup identification of him at the police precinct. The New York Supreme Court Appellate Division agreed that Williams's showup identification of Wray was the product of unduly suggestive police procedures, *see People v. Wray,* 225 A.D.2d 718, 719, 640 N.Y.S.2d 122, 124 (2d Dep't), *appeal dismissed,* 88 N.Y.2d 1025, 651 N.Y.S.2d 25, 673 N.E.2d 1252 (1996), but held, with one judge dissenting, that the error in admitting that identification was harmless. *See id.* at 719, 640 N.Y.S.2d 122, 640 N.Y.S.2d at 124. The dissenter viewed the error as not harmless, finding that the State's contention that its evidence of Wray's guilt was overwhelming was "unsupportable." *Id.* at 722–23, 640 N.Y.S.2d 122, 640 N.Y.S.2d at 125–26 (Goldstein, *J.,* dissenting). Leave to appeal to the New York Court of Appeals was denied. *See* 88 N.Y.2d 1025, 651 N.Y.S.2d 25, 673 N.E.2d 1252 (1996).

D. *The Present Proceeding*

Wray filed his present habeas petition in the district court in 1996, pursuing, to the extent pertinent here, the contention that he was denied a fair trial by the admission of Williams's showup identification. The State conceded that the admission of that evidence was error, but argued that the error had no substantial or injurious effect and thus was harmless.

In a Memorandum and Order dated June 18, 1998 ("Decision"), the district court denied the petition. It found that the remaining evidence against Wray was "strong," and that Wray's counsel had been able to "point up the weaknesses in the out of court identification by the witness and to demonstrate that neither the witness nor the complainant could identify petitioner in court as the assailant." Deci-

sion at 3. The court concluded that the admission of the showup identification testimony did not warrant a new trial because the error was harmless.

## II. DISCUSSION

In the context of an identification following a police procedure that was impermissibly suggestive, the due process focus is principally on the fairness of the trial, rather than on the conduct of the police, for a suggestive procedure "does not in itself intrude upon a constitutionally protected interest." *Manson v. Brathwaite,* 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Suggestive procedures are disapproved "because they increase the likelihood of misidentification," and it is the admission of testimony carrying such a "likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The admissibility of identification testimony, therefore, is to be determined by whether the identification is reliable. *See, e.g., Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) ("[i]t is the reliability of identification evidence that primarily determines its admissibility"); *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243 ("reliability is the linchpin in determining the admissibility of identification testimony....").

In the present case, it is undisputed that the admission at trial of Williams's showup identification of Wray at the police precinct—which was the product of a suggestive procedure in which Williams was shown only one man—was error. The State Appellate Division so found; the district court so held; the State so concedes; and we agree. The question is whether that error entitles Wray to relief.

The Supreme Court has sorted constitutional errors in criminal proceedings into two categories: "structural defects" and "trial errors." A "structural defect[]" is an error that "infect[s] the

entire trial process." *Brecht v. Abrahamson,* 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Structural errors automatically entitle the defendant to relief because they

> defy analysis by harmless-error standards.... The existence of such defects—deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process.

*Id.* (footnote and internal quotation marks omitted). "Trial error," on the other hand, does not automatically require reversal. Such an error is the type that " 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].' " *Id.* at 629, 113 S.Ct. 1710 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

■ The erroneous introduction of identification evidence is not a structural error. "[W]hile identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the integrity—of the adversary process." *Watkins v. Sowders,* 449 U.S. at 348, 101 S.Ct. 654 (internal quotation marks omitted). Therefore, the erroneous admission of unreliable identification testimony does not warrant relief from the conviction if the error was harmless. *See, e.g., Dunnigan v. Keane,* 137 F.3d 117, 130 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998); *United States v. Concepcion,* 983 F.2d 369, 379 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

■ On collateral review of a state-court conviction, a trial error is generally to be considered harmless if it did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Brecht v. Abrahamson,* 507 U.S. at 638, 113 S.Ct. 1710 ("the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type"). In *Kotteakos,* the Supreme Court explained this standard as follows:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764–65, 66 S.Ct. 1239.

In *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Court confirmed that

> [w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict," that error is not harmless. And, the petitioner must win.

*Id.* at 436, 115 S.Ct. 992. The *O'Neal* Court explained that

> [b]y "grave doubt" we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.[ ] We conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.,* as if it had a "substantial

and injurious effect or influence in determining the jury's verdict").

*Id.* at 435, 115 S.Ct. 992. "That is to say, if a judge has "grave doubt" about whether an error affected a jury in this way, the judge must treat the error as if it did so." *Id.* at 438, 115 S.Ct. 992.

■ In our assessment of whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, the principal factors to be considered are the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case. *See generally Brecht v. Abrahamson,* 507 U.S. at 639, 113 S.Ct. 1710; *Kotteakos,* 328 U.S. at 762, 66 S.Ct. 1239; *Dunnigan v. Keane,* 137 F.3d at 130; *United States v. Concepcion,* 983 F.2d at 379–80. Although the strength of the prosecution's case "is probably the single most critical factor in determining whether error was harmless," *Latine v. Mann,* 25 F.3d 1162, 1167–68 (2d Cir.1994) (internal quotation marks omitted), *cert. denied,* 514 U.S. 1006, 115 S.Ct. 1319, 131 L.Ed.2d 200 (1995); *see also Glenn v. Bartlett,* 98 F.3d 721, 729 (2d Cir.1996), *cert. denied,* 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997), the mere fact that the properly admitted evidence, standing alone, would have been sufficient to support the conviction is not determinative of whether the improperly admitted evidence had a substantial and injurious effect, *see, e.g., Moore v. United States,* 429 U.S. 20, 22, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976); *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239 ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.").

■ In assessing the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore "on an issue that is plainly critical to the jury's decision," *Hynes v. Coughlin,* 79 F.3d 285, 291 (2d Cir.1996); whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, *see,*

*e.g., Brecht v. Abrahamson,* 507 U.S. at 639, 113 S.Ct. 1710; and whether the wrongly admitted evidence was emphasized in arguments to the jury, *see, e.g., Brecht v. Abrahamson,* 507 U.S. at 639, 113 S.Ct. 1710; *Chapman v. California,* 386 U.S. 18, 25–26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Hynes v. Coughlin,* 79 F.3d at 291; *United States v. Peterson,* 808 F.2d 969, 976 (2d Cir.1987). The more tangential the issue to which the wrongly admitted evidence pertains, the less likely it is that the evidence was a substantial factor in determining the jury's verdict. Similarly, where the wrongly admitted evidence was cumulative of other properly admitted evidence, it is less likely to have injuriously influenced the jury's verdict. On the other hand, where the prosecution has emphasized the wrongly admitted evidence, it may well have been important in the minds of the jurors. *See, e.g., Chapman v. California,* 386 U.S. at 25, 87 S.Ct. 824 (comment on defendants' failure to testify not harmless where "prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly impressed the jury that [the jury could draw inferences of guilt] from the failure of petitioners to testify"); *United States v. Jean–Baptiste,* 166 F.3d 102, 108–09 (2d Cir.1999); *Hynes v. Coughlin,* 79 F.3d at 291; *United States v. Peterson,* 808 F.2d 969, 976 (2d Cir.1987). We analyze all of these issues in light of the record as a whole. *See, e.g., Brecht v. Abrahamson,* 507 U.S. at 639, 113 S.Ct. 1710; *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. 1239; *Dunnigan v. Keane,* 137 F.3d at 130.

■ In the present case, the issue on which the evidence was wrongly admitted was plainly a crucial one: identification of the defendant as the person who committed the crime. On the surface, the prosecution's case for charging Wray seems strong. Two police officers, Martorano and Weller, actually observed the robbery. Afterwards, Martorano watched the gunman enter Bea's Kitchen; Weller entered Bea's Kitchen, where he saw Wray, the

only person wearing a hat and long black coat, and he identified Wray as the gunman. Martorano testified that there was "no doubt in [his] mind" that Wray was the gunman (Tr. 401), and Weller testified that he was "[a]bsolutely" convinced that Wray was the gunman (Tr. 506). However, the officers' professions of absolute certainty are suspect when evaluated in light of the record as a whole.

First, though the officers said the lighting during the robbery was good, it was midnight, they were more than 100 feet away from the site of the robbery, the robbery took only some 20 seconds, and the officers had no binoculars or other vision aids. The principal lighting was from overhead streetlights, the officers were on a roof 15 feet above street level, and the gunman's hat had a brim. As Weller testified, "It was dark out and it was shadows." (Tr. 475.) The officers principally described the gunman's clothing; they could not describe his face except to say that it was dark-skinned with a mustache and goatee. Martorano said "that's all I can describe of his face." (Tr. 326.) Although the prosecutor argued in summation that "Weller ... told you that he remembered the face" (Tr. 720), that "Weller looked[ ] right at ... the one pointing the gun" and that "is why Officer Weller is able to remember the face of the person he saw hold the gun" (*id.*), and that when Weller went into Bea's Kitchen, "[h]e looked for the face of the person that he had seen" (Tr. 721), we see no such testimony in the record. Weller testified that the "sole basis for the arrest of this defendant was because of [Weller's] observation on the roof" (Tr. 523), and from the roof he saw nothing of the gunman's face except dark skin and "some type of growth, hair around his chin area" (Tr. 475). When asked whether he could "recall anything [else] about" the gunman's "face[ ]," Weller referred to the darkness and the shadows and stated, "It was a little tough to see[ ] the actual make up of the face." (Tr. 475.) Given the physical circumstances and the officers' acknowledgement of their limited ability to see the gunman's face, the officers' identifications of the gunman as Wray cannot be considered strong.

Further, Weller's selection of Wray inside Bea's Kitchen seems plainly to have been based on the fact that only Wray was found wearing a black hat and long black coat similar to that worn by the gunman. Weller, who had found it tough to see the actual makeup of the gunman's face except for its dark skin and some type of hair growth around the chin, did not indicate that he selected Wray based on his complexion; all of the people the officers found at Bea's were persons of color. Nor did Weller say either that he recognized Wray based on his facial hair, or that Wray was the only person he saw who had facial hair. Rather, Weller said that no one else was wearing a "similar outfit[ ]" that "fit the description." (Tr. 524.)

Surprisingly, however, the officers apparently also could not say that Wray's was the only long black coat at Bea's Kitchen. We say surprisingly because the officers knew that the gunman had seen Bailey being arrested and had immediately "turned and r[u]n back into" Bea's (Tr. 331), and the officers believed he would try to conceal himself: they first looked for the gunman in a back office and then in the dark basement; and upon returning to the main floor, they looked for him next in the "completely black" room (Tr. 491). Yet the officers made no effort to determine whether the gunman had attempted concealment by jettisoning the outer clothing he had worn during the robbery—if only to blend into the crowd in which, according to the officers, no one else was wearing an outer coat. The officers apparently did not make even a cursory attempt to determine whether there was any other long black coat on the premises.

The prosecutor argued that after the gunman had "run back into the club" he tried to "get[ ] lost in the ... crowd." (Tr. 724.) The gunman may well have done so, but that hardly seems applicable to Wray:

Wray was found standing in a well-lit room, on a raised platform, dressed in a hat and long black coat when no one else in the entire restaurant was dressed that way.

Nor was there any physical evidence to connect Wray with the crime. The prosecution could, of course, have presented an overwhelmingly strong case if Wray's fingerprints had been found on the gun Martorano saw the gunman hand to Bailey, which Weller and McCavera had promptly seized. However, the officers did not ask that the gun be tested for fingerprints. The prosecutor in summation argued that there had been no need to "look[ ] for fingerprints[.] The[ officers] saw what happened." (Tr. 721.) Yet the officers conceded they had not had a good view of the gunman's face, and they did not entirely agree on what had happened, for they did not even see the same number of robbery victims. In fact, no two witnesses agreed on the total number of persons present at the robbery: Williams testified that he and Mitchell were confronted by three robbers—a total of five persons; Mitchell recalled three robbers but thought his friend Patrick was there with him and Williams—a total of six persons; Martorano saw only Mitchell, Williams, and two robbers—a total of four persons; and Weller was absolutely sure there were two robbers and only one victim (Mitchell)—a total of three. Thus, Weller did not even see Williams during the robbery:

Q. Who is Craig Williams?

A. He's a friend of Melvin Mitchell.

Q. Was he present at the time [of the robbery]?

A. I did not see him there, no.

. . . .

Q. So your testimony is that when this robbery occurred and this gun was held at Mr. Mitchell, the only people standing there was [sic] Mr. Mitchell, the person you say is Mr. Wray and another person you say is Mr. Bailey, that's it, three people?

A. Correct.

Q. Not four?

A. Not four.

. . . .

Q. You are . . . convinced there were only three people there total?

A. Yes.

. . . .

Q. Are you as convinced of that that [sic] you are that Mr. Wray is the same person who had the gun that night?

A. Absolutely.

(Tr. 504–06.) (How ironic that the improperly admitted showup identification was made by the person Weller was sure had not been present at the robbery.)

In these circumstances, with (a) Mitchell and Williams testifying unequivocally that Wray was not the gunman, (b) no physical evidence to connect Wray to the crime, (c) the police officers poorly situated to see the gunman's face during the 20–second robbery and unable to describe him other than dark-skinned with facial hair, and (d) the officers having arrested Wray, out of 30–100 persons of color, based principally on his wearing garments similar to those that had been worn by the gunman—which the gunman could be expected to have shed—we think it indisputable that the evidence that Williams had identified Wray at the police station right after the robbery took on critical significance.

Plainly, the State believed the showup evidence was important. First, the prosecutor's opening statement described the testimony expected from Martorano and Weller, and stated that the jury "will basically hear from the victim, Melvin Mitchell" (Tr. 47); however, immediately after the opening statements, the *Wade* hearing was held and Mitchell's showup identification of Wray was suppressed, whereas the showup identification by Williams was not. In the wake of that ruling, the State called Williams as its very first witness. Williams had not even been mentioned in the opening.

In her direct examination of Williams, the prosecutor took pains to put before the jury the station-house identification, eliciting that Williams had in fact identified Wray as the robber upon seeing him at the precinct:

> Q. ... [C]an you tell us what you did at the precinct?
>
> ....
>
> A. We went to the precinct, to the— I don't know if it was a cell or if it was a room. I know it was a door and it had a little window, and he told us to peep in there to see if that was him.
>
> ....
>
> Q. And ... did you recognize that person that you were looking at?
>
> A. Yes.
>
> Q. And where did you recognize that person from?
>
> A. From the robbery.
>
> Q. All right, and what did that person do in the robbery?
>
> A. He was the one that had the gun.
>
> Q. And that's the person who you saw at the precinct?
>
> A. Yes.

(Tr. 183–84.) The direct examination ended with a series of questions that emphasized that station-house identification (*see, e.g.,* Tr. 204 ("Is [People's Exhibit 1] a picture of the person that you saw at the precinct on November 25th of 1990?")); *id.* ("People's Number 2, is that a picture of the person that you saw at the precinct on November 25th of 1990?"); *id.* ("can you tell us if that is the person that you recognized ... on November 25, 1990 at the precinct?"); Tr. 205 ("Looking at only what is now marked as number two, do you recognize the person in that picture to be the same person that you saw at the precinct on November 25th of 1990?"); *id.* (in saying that the suspect looked a little different "in the room, you mean when you saw him in the precinct?").

In a relatively brief redirect examination of Williams, the prosecutor began and ended with questions about Williams's identification at the precinct. (*See* Tr. 239 ("At the precinct when you looked at an individual in the cell, who did you say you recognized that person to be?")); Tr. 245 ("Do you recognize the person in court today as the person you saw at the precinct?").

Finally, in summation, the prosecutor began by saying briefly that Martorano and Weller saw the robbery happen, and then launched directly and repeatedly into Williams's identification of Wray at the precinct. She pointed out that Williams

> went back to the 105 Precinct after the robbery and that at that time he looked at someone and he told the police officers that was the person who had the gun

(Tr. 715); that

> he saw the profile of the face at the precinct and he said that person is the person who had the gun

(Tr. 715–16);

> that Craig *Williams had to have identified the defendant back on November 25th of 1990* because it's the only one of the two people who were arrested that fit the description that Mr. Williams gave you of the person that he recognized back then

(Tr. 716–17 (emphasis added)); and that

> if you put the testimony together of Mr. Williams' description and what *he said at the time, November 25th of 1990,* with the officer's description of who was arrested, *the only logical conclusion is that Mr. Williams identified the defendant as the one who had the gun*

(Tr. 717 (emphasis added)). The prosecutor asked the jurors to infer that, in the interval between the robbery and the trial, Williams had simply "forgotten" what Wray looked like. (Tr. 716.) She urged them to discount his trial testimony that Wray was not one of the robbers and to rely instead on his station-house identification.

We conclude that the State's present argument that the "prejudicial value" of

Williams's showup identification "was minimized by Williams's equivocal testimony as to whether he even made a positive identification that night" (State's brief on appeal at 2) rings hollow in light of the prosecutor's emphasis on that showup identification and her argument to the jury that it should disregard Williams's inability to identify Wray at trial and should rely instead on that prior inadmissible identification.

We think it also plain that that showup identification was considered by the jurors. One of their few requests during deliberations was for a rereading of "'Mr. Williams' and Mr. Mitchell's testimony as to what they saw at the precinct.'" (Tr. 771.)

In sum, Williams's wrongly admitted out-of-court identification dealt solely with the central disputed issue, the identity of the gunman. In the State's case, there was no physical evidence to link Wray to the robbery; the only admissible evidence that Wray was the gunman came from officers who, by reason of shadows, distance, altitude, and lack of binoculars, were poorly situated to see his face, and who relied principally on the fact that Wray was dressed similarly to the gunman, and so relied without attempting to determine whether there were other similar garments on the premises into which the officers knew the gunman had fled; and the victims of the hold-up testified that Wray was not the gunman. Given the frailties in the State's properly admitted evidence, along with the prosecutor's emphasis on Williams's showup identification of Wray—evidence that was inadmissible precisely because of the likelihood of misidentification—and the jury's request to hear that evidence again, we cannot conclude that the erroneously admitted showup identification evidence was unimportant or that that evidence was not a substantial factor in the jury's finding that the gunman was Wray. We conclude that the error was not harmless.

## CONCLUSION

We have considered all of the State's arguments in support of its harmless-error contention and have found them to be without merit. For the foregoing reasons, the judgment of the district court is reversed. The matter is remanded for entry of a judgment conditionally granting the writ, ordering Wray's release unless the State affords him a new trial within such reasonable period as the district court shall set.