Brendan **COCHRANE**

v.

**John McGINNIS, Superintendent, Downstate Correctional Facility**

**No. CV00–788 (JBW).**

United States District Court, E.D. New York.

Aug. 8, 2001.

*Amended Memorandum, Order
and Judgment*

WEINSTEIN, Senior District Judge.

This is a strange and troubling case of a faceless, violent motorcyclist who shot the driver of an automobile in a fit of road rage. Whether that cyclist is petitioner was the question for the jury. It found that he was.

## I. *Introduction:*

Petitioner, a young man gainfully employed in the film industry with no criminal record, was convicted of attempted murder, assault in the second degree and criminal possession of a weapon following a state jury trial in February 1997. He was sentenced to from ten to twenty years in prison. He seeks a writ of habeas corpus on the ground that he was denied an ade-

quate opportunity to defend himself. He has not demonstrated that his constitutional rights were violated. 28 U.S:C. § 2254.

## II   *Facts:*

### A.   Evidence of State

In the early morning hours of October 28, 1995, there was a traffic dispute on the Brooklyn Bridge between a driver and passengers riding in a car and petitioner, who was riding a motorcycle and wearing a helmet with a face visor. The motorcycle was distinctive in design and color; so too was the black and red striped helmet and visor. Immediately after the incident petitioner met a police van, lifted his helmet, and complained about the driver of the car. When the police said they would take no action since there were no injuries, petitioner responded that he would get his own "revenge."

Some thirty minutes later an unidentified, helmeted person (whose face was fully obscured) riding a motorcycle closely resembling the one petitioner had driven on the bridge, dressed distinctively in what appeared to be the same clothes and helmet, fired shots at the rear window of the same car, striking the driver in the shoulder. The shooting occurred in the general area of the traffic dispute. (In the interim the passengers and the driver of the car had spent some time dropping one of the passengers off at her home.)

Shortly after the shooting another police officer noticed a helmeted person (whose face he could not see) pushing a motorcycle into a parking lot not far from the Brooklyn Bridge exit. Almost immediately thereafter, that officer responded to a call informing him of the shooting. The driver and the passengers in the car told the officer that the perpetrator (whose face was covered) was dressed in clothes and riding a motorcycle similar to those the occupants of the car described as having seen during the bridge traffic dispute. This description matched that of the officer who had observed a cyclist in the parking lot not far from the Brooklyn Bridge exit.

Investigating officers uncovered a spent bullet on the floor of the car. A cartridge for a nine millimeter gun was found in the street where the shooting had occurred.

When an officer ran a license plate check on the motorcycle in the parking lot petitioner was identified as the owner. The police then located him at his nearby apartment. Questioned early that morning petitioner admitted having had the traffic dispute on the bridge, but denied involvement in the shooting. He also stated that the motorcycle in the lot was his and that he had parked it there within the hour. He was arrested.

The police searched petitioner's apartment the following day. In a front bedroom of the apartment they seized three photographs on Polaroid film. The photographs, which were displayed on a windowsill, showed a person, who the state claims is petitioner, on a bed with a gun that appeared to resemble a nine millimeter pistol, the weapon described by those in the car as having been used in the shooting. A nine millimeter gun was found in the bed clothes of that bedroom. There were no fingerprints on the gun. Fingerprints on a spare magazine, also discovered in that bedroom, did not match those of petitioner. The gun had been fired and its magazine had several shells missing. Ballistics evidence demonstrated that the shell and bullet retrieved by the police were from the gun found in petitioner's apartment.

At trial the prosecutor introduced the three Polaroid photographs. Defendant did

not object to their admission or to a police officer's conclusion that they showed the petitioner. .

### B.   Defense Contentions at State Trial

Defense counsel had taken the position in the opening that if the jury compared petitioner to the person depicted in the three photographs they would conclude that they were different people. Petitioner argued that he was the victim of a misidentification.

First, defense counsel contended that the bedroom was occupied by petitioner's roommate. The roommate did not appear as a witness and no evidence was introduced to establish that such a person existed.

Second, petitioner produced a fourth Polaroid photograph which he contended had been part of the same package of film as the other three, warranting a reasonable doubt that he was the shooter. Specifically, he argued that the clothing, visage and posture of the figure in the fourth photograph as well as the photograph's comparative clarity demonstrated that the person in that picture was the same person featured in the first three pictures, and that petitioner was not that person. No account was presented of the source or custody of this fourth image.

To further substantiate the defense theory, petitioner offered an expert—— whose capabilities were unchallenged—— to testify that the fourth photograph was from the same package of Polaroid film as the three introduced by the prosecution and that it represented the next picture that would have been taken after the first three. His expert was offered to testify that the markings on the back of the photographs demonstrated that the one petitioner proposed to introduce was the fourth in the series following the three the prosecutor had introduced and that petitioner and the person depicted in the fourth photo were different people.

### C.   Rulings of Trial Court

The trial court refused to admit the fourth picture or defense expert's testimony. No clear reason was given for the ruling. It was arguably based on the following voir dire by the prosecutor:

> Q. But based on the sequence of numbers [of the four Polaroids], it can't tell you what date they were taken on?
>
> A. No.
>
> [Q]: No further questions (Tr. 918–19).

The first three pictures were arguably taken before the shooting since they were in petitioner's apartment when it was searched shortly after the incident. The fourth picture was revealed only at the trial, more than a year later. It may have been taken of a rigged scene designed to produce a misleading impression. Without proof of source and timing it would lack relevance.

### D.   Federal Habeas Corpus Proceedings

Beginning in January 2001, this court held a series of evidentiary hearings. The three photographs relied upon by the state were no longer available. They are unexplainably missing from the prosecution's files. The fourth, submitted by petitioner, demonstrated a lack of resemblance to petitioner.

Two witnesses who were involved in the making of a moving picture in petitioner's apartment testified that all four of the Polaroid photographs were taken in the

course of the production of the motion picture—presumably before the shooting. Both witnesses testified that the figure in petitioner's exhibit at this court's hearing, an enlargement of the fourth Polaroid photograph that the trial court had refused to admit, was not petitioner, but an actor in the film. Neither of these witnesses testified at the state trial; there was no showing that they had been unavailable.

The commercial photographer who was not allowed to testify as a defense expert in the state trial testified at the habeas hearing that he had examined all four photographs at the time of trial; that the first three photographs in the package of film were shot in such a way that the identity of the figure in the pictures was unclear; and that his own visual comparison indicated that the person depicted in the fourth photograph was not petitioner. The witness also testified that based upon his examination of the photographs at the state trial, he was certain that all four photographs depicted the same person and that they were taken successively from the same package of Polaroid film. He did not claim to know when the fourth picture was taken.

## III   Law:

■ The erroneous introduction or preclusion of identification evidence is considered a "trial error." *See Wray v. Johnson,* 202 F.3d 515, 524 (2d Cir.2000) ("[W]hile identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart— the integrity— of the adversary process.") (*quoting Watkins v. Sowders,* 449 U.S. 341, 348, 101 S.Ct. 654, 654, 66 L.Ed.2d 549 (1981)). A "trial error" does not automatically require setting aside a state-court conviction; it triggers a harmless-error analysis. *See id.* (*quoting Ari-*

*zona v. Fulminante,* 499 U.S. 279, 307, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

■ The court of appeals for the Second Circuit has summarized the test for determining whether a limitation on the right to present evidence rises to the level of a constitutional violation as follows:

> [W]hether the exclusion of testimony violated [defendant's] right to present a defense depends upon whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist."

*Washington v. Schriver,* 255 F.3d 45, 56 (2d Cir.2000) (*quoting Jones v. Stinson,* 229 F.3d 112, 120 (2d Cir.2000)) (alterations in the original) (citations omitted).

■ In deciding whether the erroneous admission or preclusion of identification evidence constitutes harmless error the court of appeals has considered such factors as the importance of the witness's wrongly admitted or excluded testimony, the overall strength of the prosecution's case, whether the evidence bore on an issue critical to a jury's decision, whether the wrongly admitted or excluded evidence was emphasized in arguments to the jury, whether that testimony was relevant to a material proposition of fact, and whether it was merely corroborative and cumulative. *See id.* at 56.

## IV   Application of Law to Facts:

■ A trial court may properly exclude testimony that the person depicted in a photograph and the defendant did or did not resemble each other since the jury can itself make the comparison. The fact that one witness is allowed to testify to the resemblance of the defendant and the person depicted in photographs (without objection) and that another witness (after

objection) is, not does not constitute constitutional error.

■ Who was depicted in the fourth photograph (and by inference who was in the first three) and expert testimony as to whether all the photographs were developed from the same package of film could have been useful in identification. No one could directly identify the shooter because all of his facial features were obscured by a helmet with a full mask.

The prosecution's case was subject to attack. It relied on circumstantial inferences that the cyclist observed by the police and the cyclist seen by those in the car were the same person. Were the fourth picture properly authenticated it might well have led to a verdict of not guilty. Unfortunately for petitioner it was not properly identified as having been taken before the shooting.

In *Wray v. Johnson*, 202 F.3d 515 (2d Cir.2000), the court of appeals for the Second Circuit granted a writ of habeas corpus because of the uncertainty of the circumstantial identification relied upon by the prosecution. The identification evidence in *Wray* consisted of testimony by two police officers that they witnessed a man wearing a hat and a long coat commit an armed robbery in front of a nightclub and then flee into the club. *See id.* at 527. The police officers immediately entered the nightclub where they apprehended a man wearing a hat and a long coat whom they believed was the same person as the perpetrator of the crime. *Id.*

In granting the writ in *Wray*, the court of appeals emphasized that the only admissible evidence that the petitioner was the same person as the perpetrator came from officers who were poorly situated to see the perpetrator's face due to distance, bad lighting and shadows, and who relied principally on the fact that the petitioner was dressed similarly to the perpetrator; they made no attempt "to determine whether there were other similar garments on the premises into which the officers knew the gunman fled." *Id.* at 530. Additionally, the victims of the hold-up testified at trial that the petitioner was not the same person as the perpetrator. *Id.*

The instant case does not provide as strong a basis for granting the writ as did *Wray*. While the passengers in the car were unable to see either the petitioner's face during the traffic dispute or the perpetrator's face during the subsequent shooting, a police officer with whom petitioner spoke shortly after the dispute, but before the shooting, did see the petitioner with his visor up.

There was additional circumstantial proof from which a jury could conclude that petitioner was the shooter. First, the police officer's description of the petitioner's clothing and motorcycle when he complained to the police was consistent with the clothing and motorcycle described by another police officer who saw a helmeted individual pushing a motorcycle into a parking lot shortly after the shooting, as well as with what those in the car saw at the time of the shooting. Second, the gun depicted in the Polaroid photographs appeared to be similar to the gun described by those in the car as having been used in the shooting. The shell and bullet found by the police and connected to the crime were traced to the gun discovered in a bedroom of petitioner's apartment.

There was also some proof of motive since petitioner was positively identified as the person who complained of the traffic argument. That dispute might have provided a reason to shoot at the driver of the car. The police officer who spoke with

petitioner about the traffic incident testified that he stated that he would take "revenge" on his own because the police would not act on his behalf.

Contrariwise, the fact that petitioner made his visage known when he complained about the other driver's action to the police makes it less likely that he was about to utilize self-help to actually follow through with his threat and take revenge in a shooting rage. He had already revealed his identity to the police and, in effect, requested that the law take action on his behalf.

It is possible, albeit unlikely, that someone else with access to petitioner's apartment was the shooter. Defense counsel suggested, but never proved, that petitioner had a roommate who occupied the bedroom in question. The habeas hearing showed that the apartment was used for film production purposes as well as residential living. Because of the significant number of people who might have crossed petitioner's threshold to work on the film, another motorcyclist with access to the apartment could conceivably have shot at the car and stashed the weapon in the bedroom. All this is speculative since no supporting evidence for petitioner's theory was produced at the trial.

Defense counsel had argued that, contrary to the people's summation, the first three photographs did not depict petitioner. The clarity of the excluded photograph together with the precluded testimony of the expert witness as to the source from the same Polaroid pack might well have created a reasonable doubt that petitioner was the person in the first three photographs, thereby making a verdict of guilt much less likely. A "reasonable doubt that did not otherwise exist" could have been created by the excluded evidence. *See Washington v. Schriver*, 255 F.3d at 56.

■ At the state trial, there was no issue explicitly raised of authenticity, the time of the taking of the fourth Polaroid, or the chain of custody. Tr. 905–20. Exclusion appeared, however, to have been based on the possibility that the fourth picture was taken after petitioner's arrest in order to mislead the trier. In general, a trial judge need not give the basis for an evidentiary ruling so long as the ruling is justified and does mislead counsel to a client's detriment. *See, e.g.,* John Henry Wigmore, Evidence in Trials at Common Law §§ 19, 20, 20a, 21 (Rev. by Peter Tillers, 1983); Edith L. Fisch, Fisch on New York Evidence: Civil and Criminal §§ 18–24 (2d ed.1977), Cum.Supp. 9–12 (2001); Michael M. Martin, Daniel J. Capra, & Faust J. Rossi, New York Evidence Handbook § 1.4 (1997) (preserving evidentiary rulings for appeal).

Authentication and chain of custody were never explicitly mentioned at the state trial. Had these issues been more pointedly raised as a ground for exclusion based upon the time the fourth photograph was taken, defendant might have satisfied the objection by the kind of evidence produced at the habeas hearing in this court. But that evidence was never offered by counsel.

The fact that the photographs introduced by the state were not available at the habeas hearing is not, in this instance, a basis for an attack on the conviction. No one has suggested that reasonable persons could not have agreed, as the jury may have, that petitioner and the person shown in the three photographs were the same. There is no evidence of deliberate spoliation by the state. Moreover, the jury may well have ignored the pictures and decided solely on the circumstantial evidence and the identification of petition by the police.

Inadequacy of counsel is not a basis for granting the writ. The trial record demonstrates that defense counsel was aggressive in preparing for, and in conducting, the trial. The fact that more talented counsel might possibly have obtained an acquittal is not a basis for a claim of constitutional error.

## V. *Conclusion:*

On balance, the trial court appears to have been within its discretion in precluding the fourth photograph, even if it came from the same Polaroid pack as the three introduced by the state, and the expert's testimony. Petitioner was not denied the opportunity of demonstrating to the jury that the state had not proven him guilty beyond a reasonable doubt.

Yet, the case is troubling. This court first concluded that the writ should be granted. Upon a rereading of the transcript from the state court, the appellate record, and the transcript in this court, the conclusion that petitioner was not denied a fair trial seems sound. This memorandum effects all corrections. There was no error.

The petition for a writ of habeas corpus is denied.

A certificate of appealability based upon lack of adequate trial counsel and denial of the opportunity to submit evidence is granted.

SO ORDERED