Raymond WRAY, Plaintiff,

v.

CITY OF NEW YORK, New York City Police Department, Daniel Martorano, Police Officer, William Weller, Police Officer, James McCavera, Police Officer, and Police Officers "John Does" including supervisors, in their Individual and Official Capacities, Defendants.

No. 01–CV–04837.

United States District Court, E.D. New York.

Oct. 18, 2004.

Robert Rosenthal, Esq., New York City, for Plaintiff.

Corporation Counsel of the City of New York by Liora Jacobi, Esq., New York City, for Defendants.

Dawn M. Cardi & Associates by Dawn M. Cardi, Esq., Robert Rosenthal, Esq. by

MEMORANDUM, ORDER and JUDGMENT

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295

II. Facts and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

III. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301
 A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301
 B. Police Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301
 1. Individual Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301
 a. False Arrest and False Imprisonment . . . . . . . . . . . . . . . . . . . . . . . . 301
 b. Use of Suggestive Showup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302
 c. Malicious Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302
 d. Failure to Intercede . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302
 2. Official Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303
 C. New York City Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303
 D. City's Failure to Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303
 1. Police Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304
 2. District Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304
 E. Notice of Claim under New York City General Municipal Law . . . . . . . . . . . . . . 305

IV. Application of Law to Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305
 A. Police Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305
 1. Individual Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305
 a. False Arrest and False Imprisonment . . . . . . . . . . . . . . . . . . . . . . . . 305
 b. Use of Suggestive Showup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
 c. Malicious Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
 d. Failure to Intercede . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
 2. Official Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
 B. New York City Police Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307
 C. City's Failure to Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307
 1. Police Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307
 2. District Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307
 D. Notice of Claim under New York City General Municipal Law . . . . . . . . . . . . . . 307

V. Interlocutory Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

## I. *Introduction*

Plaintiff Raymond Wray—found to have been improperly convicted in state court for an armed robbery and then "exonerated"—states an arguably viable section 1983 claim against police officer William Weller for conducting an improperly suggestive showup at a police precinct lockup

and against the City of New York for failure to train the police on proper identification procedures. Remaining claims against police officers and the City are dismissed. Wray's argument that the City is responsible for failing to train district attorneys not to use illegally obtained evidence cannot be countenanced; in the criminal courts district attorneys are independent of municipal control.

In setting aside Wray's conviction, the Court of Appeals for the Second Circuit—as did the Appellate Division on a direct appeal and the federal district court on a habeas petition—found the showup by the police at the station house unconstitutionally suggestive. Unlike these other courts, however, the Court of Appeals found the police investigation so flawed and proof of guilt so inadequate as to require setting aside the conviction because of use of evidence of the showup at trial.

Wray sought federal habeas corpus relief after his convictions for robbery and weapons offenses were upheld on direct appeal. He alleged that he was denied due process when the state trial court improperly permitted the use of testimony regarding a witness's out of court showup identification at a precinct lockup. His petition was dismissed by this court. The Court of Appeals for the Second Circuit reversed. It concluded that the admission of the showup evidence was not harmless error. The Queens District Attorney declined to retry Wray. State court charges were then dismissed.

Wray sues the City of New York under section 1983 of title 42 of the United States Code, asserting pendent jurisdiction over related state law claims. Also named as defendants are the Police Department and police officer Daniel Martorano, police officer William Weller, police sergeant James McCavera and unnamed police officers, in their individual and official capacities. Alleged are federal constitutional and state law violations arising out of Wray's arrest and the use of the showup evidence. Damages and injunctive relief are sought requiring training by the City of police and district attorneys on proper identification procedures.

Defendants move for summary judgment on various grounds. They include the existence of probable cause, qualified immunity and failure to state a claim under section 1983 and state causes of action.

II. *Facts and Procedural History*

Shortly after midnight on November 25, 1990, officers Martorano, Weller and McCavera were at a stakeout observing the front of a restaurant from a rooftop across the street. Officers Martorano and Weller say they saw Wray, in the company of Dennis Bailey, point a gun at Melvin Mitchell and take Mitchell's jacket. Mitchell was accompanied by his friend Craig Williams. Officers Weller and McCavera promptly left the rooftop to apprehend the robbers while officer Martorano remained on the roof, called for backup and stayed in radio contact with his two team members. Officer Martorano observed Wray and his accomplice, Bailey, walk to the restaurant; Wray handed the gun to Bailey, who remained on the street, and then went into the restaurant. Weller and McCavera arrested Bailey, who was carrying a gun.

As Bailey was being escorted to a marked backup police car, officers Martorano and Weller say they saw Wray come out of the restaurant, observe the arrest and run back in. Officer Weller looked inside the restaurant and spotted Wray standing at the back, looking directly at him. Officer Weller then went into the restaurant with officer McCavera and a uniformed police officer, found the stolen

jacket, and arrested Wray, who had no weapon.

The victim, Mitchell, and his friend Williams were not on the scene when the arrests occurred, but Mitchell returned to the scene almost immediately and an officer asked him to go to the police station. Within an hour of the arrests, the victim, Mitchell, and his friend Williams were at the station house.

The evidence as to identification at the police station is ambiguous. According to the police, Mitchell and Williams each separately identified Wray, then in a jail cell, as the gunman. Officer Martorano brought Mitchell to the holding cell, pointed to Wray and asked whether Mitchell recognized the prisoner. Officer Martorano recollected that Mitchell confirmed that Wray was the gunman who had taken his jacket. Mitchell testified both before the grand jury and at *Wade* hearing that he told the police that Wray was *with* the gunman, not that he *was* the gunman. The recollections of officer Martorano and Mitchell also differed on whether Wray was alone or with one other person in the cell.

It is agreed that Williams positively identified Wray, while he was in a cell, as the gunman. There is no indisputable information in the record identifying the police officer who brought Williams to the holding cell to identify Wray, aside from Williams' statement, "I think his name starts with a W. Wellie," which a jury, on the other evidence, might find referred to officer Weller.

After Wray was indicted, he moved to dismiss the indictment. The New York state trial court denied Wray's motion, finding that "the evidence adduced before the Grand Jury was legally sufficient to support the charges in the Indictment," the legal instructions given by the District Attorney to the Grand Jury were proper,

and "the Indictment is sufficiently specific." Meanwhile, Bailey pled guilty to criminal possession of a weapon. Bailey stated at his allocution that Wray had handed the gun to him but he did not see or know anything about how Wray got the jacket.

At a *Wade* hearing the trial judge suppressed any evidence of Mitchell's station house identification of Wray, but found that Mitchell had an independent basis to make an in-court identification. The court ruled that Williams would be allowed to testify to his identification of Wray at the station house; although Williams was unable to recognize Wray at the *Wade* hearing, he testified that he had seen the robbers around the neighborhood before and after the robbery.

At trial officers Martorano and Weller each identified Wray as the gunman. Neither Williams nor Mitchell recognized Wray as the gunman. Williams did not even recognize Wray as a robber but testified, at different points, that the person he had seen from a side view at the showup was or "looked like" the gunman. When shown the photographs of Wray taken at the police station, Williams testified that the person in the photographs "kind of" looked like the person he had seen at the showup; in the end, he testified that he was uncertain as to whether Wray was the person he had seen at the police station. Mitchell testified that he was certain that Wray was not the gunman but uncertain as to whether Wray was one of the robbers.

Wray testified in his own defense, denying any involvement in the robbery. He testified that he was wearing his hat and coat because it was cold in the restaurant and that almost everyone in the restaurant was wearing overcoats, even those who were dancing. Two witnesses testified on his behalf, the owner of the restaurant and

a friend, each of whom in essence conceded that it was possible that Wray had left the restaurant for a time just before and during the robbery. There was also testimony that it was warm in the restaurant and that some or most people were not wearing coats.

Wray was convicted of two counts of first degree robbery, one count of second degree criminal possession of a weapon, and one count of third degree criminal possession of a weapon. His conviction was affirmed by the Appellate Division. It found the station house showup impermissibly suggestive, but not violative of the Constitution because of the strong evidence of guilt. *People v. Wray,* 225 A.D.2d 718, 640 N.Y.S.2d 122 (2d Dep't 1996).

A federal writ of habeas corpus was then sought. The petition alleged that Wray was denied due process when the state trial court improperly admitted evidence of Williams' out of court police station showup identification. The petition was dismissed because, while the admission of the showup evidence constituted a due process violation, it was harmless in light of the strong evidence of guilt. *Wray v. Johnson,* No. 96 CV 5139, 1998 WL 426569, at *1 (E.D.N.Y. June 18, 1998).

In reversing, the Court of Appeals for the Second Circuit noted that "a suggestive procedure 'does not in itself intrude upon a constitutionally protected interest,'" and examined the totality of the circumstances to assess the fairness of the trial. *Wray v. Johnson,* 202 F.3d 515, 524–30 (2d Cir.2000). It ruled that the error was not harmless because the court "cannot conclude that the erroneously admitted showup identification evidence was unimportant or that that evidence was not a substantial factor in the jury's finding that the gunman was Wray." *Id.* at 530. It opined that the police should have done a more thorough investigative job before arresting petitioner. The detailed analysis of the facts by the Court of Appeals for the Second Circuit follows:

In the present case, the issue on which the evidence was wrongly admitted was plainly a crucial one: identification of the defendant as the person who committed the crime. On the surface, the prosecution's case for charging Wray seems strong. Two police officers, Martorano and Weller, actually observed the robbery. Afterwards, Martorano watched the gunman enter Bea's Kitchen; Weller entered Bea's Kitchen, where he saw Wray, the only person wearing a hat and long black coat, and he identified Wray as the gunman. Martorano testified that there was "no doubt in [his] mind" that Wray was the gunman (Tr. 401), and Weller testified that he was "[a]bsolutely" convinced that Wray was the gunman (Tr. 506). However, the officers' professions of absolute certainty are suspect when evaluated in light of the record as a whole.

First, though the officers said the lighting during the robbery was good, it was midnight, they were more than 100 feet away from the site of the robbery, the robbery took only some 20 seconds, and the officers had no binoculars or other vision aids. The principal lighting was from overhead streetlights, the officers were on a roof 15 feet above street level, and the gunman's hat had a brim. As Weller testified, "It was dark out and it was shadows." (Tr. 475.) The officers principally described the gunman's clothing; they could not describe his face except to say that it was dark-skinned with a mustache and goatee. Martorano said "that's all I can describe of his face." (Tr. 326.) Although the prosecutor argued in summation that "Weller ... told you that he remem-

bered the face" (Tr. 720), that "Weller looked[ ] right at ... the one pointing the gun" and that "is why Officer Weller is able to remember the face of the person he saw hold the gun" (*id.*), and that when Weller went into Bea's Kitchen, "[h]e looked for the face of the person that he had seen" (Tr. 721), we see no such testimony in the record. Weller testified that the "sole basis for the arrest of this defendant was because of [Weller's] observation on the roof" (Tr. 523), and from the roof he saw nothing of the gunman's face except dark skin and "some type of growth, hair around his chin area" (Tr. 475). When asked whether he could "recall anything [else] about" the gunman's "face[ ]," Weller referred to the darkness and the shadows and stated, "It was a little tough to see[ ] the actual make up of the face." (Tr. 475.) Given the physical circumstances and the officers' acknowledgement of their limited ability to see the gunman's face, the officers' identifications of the gunman as Wray cannot be considered strong.

Further, Weller's selection of Wray inside Bea's Kitchen seems plainly to have been based on the fact that only Wray was found wearing a black hat and long black coat similar to that worn by the gunman. Weller, who had found it tough to see the actual makeup of the gunman's face except for its dark skin and some type of hair growth around the chin, did not indicate that he selected Wray based on his complexion; all of the people the officers found at Bea's were persons of color. Nor did Weller say either that he recognized Wray based on his facial hair, or that Wray was the only person he saw who had facial hair. Rather, Weller said that no one else was wearing a "similar outfit[ ]" that "fit the description." (Tr. 524.)

Surprisingly, however, the officers apparently also could not say that Wray's was the only long black coat at Bea's Kitchen. We say surprisingly because the officers knew that the gunman had seen Bailey being arrested and had immediately "turned and r[u]n back into" Bea's (Tr. 331), and the officers believed he would try to conceal himself: they first looked for the gunman in a back office and then in the dark basement; and upon returning to the main floor, they looked for him next in the "completely black" room (Tr. 491). Yet the officers made no effort to determine whether the gunman had attempted concealment by jettisoning the outer clothing he had worn during the robbery—if only to blend into the crowd in which, according to the officers, no one else was wearing an outer coat. The officers apparently did not make even a cursory attempt to determine whether there was any other long black coat on the premises.

The prosecutor argued that after the gunman had "run back into the club" he tried to "get[ ] lost in the ... crowd." (Tr. 724.) The gunman may well have done so, but that hardly seems applicable to Wray: Wray was found standing in a well-lit room, on a raised platform, dressed in a hat and long black coat when no one else in the entire restaurant was dressed that way.

Nor was there any physical evidence to connect Wray with the crime. The prosecution could, of course, have presented an overwhelmingly strong case if Wray's fingerprints had been found on the gun Martorano saw the gunman hand to Bailey, which Weller and McCavera had promptly seized. However, the officers did not ask that the gun be tested for fingerprints. The prosecutor in summation argued that there had been no need to "look[ ] for

fingerprints [.] The [officers] saw what happened." (Tr. 721.) Yet the officers conceded they had not had a good view of the gunman's face, and they did not entirely agree on what had happened, for they did not even see the same number of robbery victims. In fact, no two witnesses agreed on the total number of persons present at the robbery: Williams testified that he and Mitchell were confronted by three robbers—a total of five persons; Mitchell recalled three robbers but thought his friend Patrick was there with him and Williams—a total of six persons; Martorano saw only Mitchell, Williams, and two robbers—a total of four persons; and Weller was absolutely sure there were two robbers and only one victim (Mitchell)—a total of three. Thus, Weller did not even see Williams during the robbery:

Q. Who is Craig Williams?

A. He's a friend of Melvin Mitchell.

Q. Was he present at the time [of the robbery]?

A. I did not see him there, no.

. . . . .

Q. So your testimony is that when this robbery occurred and this gun was held at Mr. Mitchell, the only people standing there was [*sic*] Mr. Mitchell, the person you say is Mr. Wray and another person you say is Mr. Bailey, that's it, three people?

A. Correct.

Q. Not four?

A. Not four.

. . . . .

Q. You are ... convinced there were only three people there total?

A. Yes.

. . . . .

Q. Are you as convinced of that that [*sic*] you are that Mr. Wray is the same person who had the gun that night? A. Absolutely.

(Tr. 504–06.) (How ironic that the improperly admitted showup identification was made by the person Weller was sure had not been present at the robbery.)

In these circumstances, with (a) Mitchell and Williams testifying unequivocally that Wray was not the gunman, (b) no physical evidence to connect Wray to the crime, (c) the police officers poorly situated to see the gunman's face during the 20–second robbery and unable to describe him other than dark-skinned with facial hair, and (d) the officers having arrested Wray, out of 30–100 persons of color, based principally on his wearing garments similar to those that had been worn by the gunman—which the gunman could be expected to have shed—we think it indisputable that the evidence that Williams had identified Wray at the police station right after the robbery took on critical significance.

*Id.* at 526–28.

The Queens District Attorney declined to re-try Wray, who by that time had served almost his full term, approximately eight years. The state trial court then dismissed the indictment and all pending criminal charges on July 24, 2000.

A year later, on July 20, 2001, Wray sued under section 1983 of title 42 of the United States Code and state law. Among other claims, he asserted: false arrest, false imprisonment, use of a suggestive showup at the station house, malicious prosecution, failure to intercede to prevent denial of his rights and failure of the City to train or supervise police officers as well as district attorneys and their staffs.

After commencing this federal action, on July 31, 2001, Wray filed a Notice of Claim with the City of New York for "[f]alse imprisonment, wrongful imprisonment, wrongful conviction and wrongful prosecution, [and] violation of State and Federal Constitutional Rights."

Defendants' summary judgment motion rests on a variety of grounds, including the existence of probable cause for the arrest and prosecution, qualified immunity, failure to state a claim under section 1983, and failure to file a timely claim against the City.

## III. Law

### A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Evidence is evaluated in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Police Officers

#### 1. Individual Capacity

■ "Police officers are immune from liability for money damages in suits brought against them in their individual capacities if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir.2003) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[E]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a govern-

ment actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Id. (citing Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995)). A defendant is entitled to summary judgment on qualified immunity grounds when

> [N]o reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively reasonable for the defendant[ ] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

Lennon, 66 F.3d at 420 (quoting Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987) (internal quotations omitted)). Summary judgment for the defendant is appropriate where a trier of fact would find that reasonable officers could disagree about the legality of the defendant's conduct under the circumstances. Id.

#### a. False Arrest and False Imprisonment

■ Section 1983 provides a cause of action against any person who, acting under color of state law, deprives another person of any right, privilege or immunity secured by the federal constitution or federal laws. 42 U.S.C. § 1983. A section 1983 claim for false arrest is "substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996). The elements of a state and a federal claim for false imprisonment are also essentially like those for false arrest. Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir.1995). To establish a claim for false arrest under section 1983, a plaintiff must show that " 'the defendant intentionally confined him without his consent and without justification.' " Escalera v. Lunn, 361 F.3d 737, 743

(2d Cir.2004) (quoting *Weyant,* 101 F.3d at 852).

■■■ The existence of probable cause to arrest the plaintiff constitutes justification and defeats a claim for false arrest. *Id.* An officer has probable cause to arrest when the arresting officer, at the moment of arrest, has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* "Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Id.* Arguable probable cause exists if either (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met." *Id.; see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997).

#### b. *Use of Suggestive Showup*

■■■ Suggestive identification procedures are disapproved "because they increase the likelihood of misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *see also State v. Riley,* 70 N.Y.2d 523, 522 N.Y.S.2d 842, 517 N.E.2d 520, 523 (1987) (noting that showup identification is strongly disfavored but permissible under certain circumstances and holding that such identifications of arrested persons held at police stations, absent exigency, is inadmissible as a matter of law). A suggestive identification such as a one-to-one confrontation does not itself constitute a violation of a constitutional right. *Biggers,* 409 U.S. at 198, 93 S.Ct. 375 ("[T]he admission of evidence of a showup without more does not

violate due process"); *Wray,* 202 F.3d at 524 ("[A] suggestive procedure 'does not in itself intrude upon a constitutionally protected interest.'" (quoting *Manson v. Brathwaite,* 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977))); *United States v. Bautista,* 23 F.3d 726, 730 (2d Cir.1994) (discussing the requirement that police officers make "immediate reasonable efforts" to confirm a suspect's identity). The due process inquiry with respect to the use at trial of an identification following an impermissibly suggestive police procedure focuses on the fairness of the trial. *Wray,* 202 F.3d at 524.

#### c. *Malicious Prosecution*

■■■ To establish a claim for malicious prosecution under section 1983, a plaintiff must show that "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and (4) the matter terminated in the plaintiff's favor." *Ricciuti,* 124 F.3d at 130; *see also Cook v. Sheldon,* 41 F.3d 73, 79 (2d Cir.1994) ("Though section 1983 provides the federal claim, we borrow the elements of the underlying malicious prosecution tort from state law"). As with claims for false arrest or false imprisonment, the existence of probable cause defeats a claim for malicious prosecution. *See Ricciuti,* 124 F.3d at 130. "Malice" means " 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (quoting *Nardelli v. Stamberg,* 44 N.Y.2d 500, 406 N.Y.S.2d 443, 377 N.E.2d 975, 976 (1978)).

#### d. *Failure to Intercede*

■■■ "A police officer 'has an affirmative duty to intercede on the behalf of a

citizen whose constitutional rights are being violated in his presence by other officers.' " *Ricciuti*, 124 F.3d at 129. "Failure to intercede to prevent an unlawful arrest can be grounds for section 1983 liability" provided that a plaintiff overcomes the hurdle of qualified immunity. *Id.*

■ A police officer cannot be held liable in damages for failure to intercede unless (1) the failure permitted fellow officers to violate " 'clearly established statutory or constitutional rights' of which a reasonable person would have known" and (2) the failure to intercede was "under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Id.* "To obtain summary judgment on qualified immunity grounds in connection with a claim of failure to intercede to prevent an illegal arrest, a defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest." *Id.*

### 2. *Official Capacity*

■ Claims against police officers in their official capacity are analyzed as if the claims were brought against the City of New York. *See Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir.1988) ("Official capacity suits . . . are, in all respects other than name, suits against a government entity.").

### C. *New York City Police Department*

■ The City of New York, rather than the New York City Police Department, is the proper entity for suit; the Department is a non-suable agency of the City. *See* NYC CHARTER § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New

York and not in that of any agency, except where otherwise provided by law."); *see also Morris v. New York City Police Dep't*, No. 98 CIV 6607, 1999 WL 1201732, at *3 (S.D.N.Y. Dec. 14, 1999) (dismissing claims against the New York Police Department because it is an agency of the City), *aff'd in part and vacated in part*, 59 Fed.Appx. 421, 422–23, 2003 WL 943780, at *2 (2d Cir.2003) (summary order) (directing the district court to permit amendment of the complaint to name the City of New York as a defendant).

### D. *City's Failure to Train*

■ A municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "A municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018. "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983).

■ The inadequacy of city employees training may constitute a city policy or custom that is actionable under section 1983 only if the failure amounts to "deliberate indifference" to the rights of those with whom the city employees come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To establish that a municipality's failure to train or supervise constitutes "deliberate indifference" to the rights of citizens, a plaintiff must show that (1) a policymaker knows that employees will confront a given situation, (2) the situation either presents the employee with "a diffi-

cult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation," and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992). Failing to train for rare or unforseen events does not show deliberate indifference. *Id.* at 297.

### 1. *Police Officers*

■ Where, as in this case, there is a police training program regarding identification procedures, the City's liability depends on the adequacy of the training program in relation to the tasks that officers must perform. *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197. If the training program is not adequate, then the focus is on "whether such inadequate training can justifiably be said to represent 'city policy.' " *Id.* "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91, 109 S.Ct. 1197. "And, plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* at 391, 109 S.Ct. 1197.

### 2. *District Attorneys*

■ The Court of Appeals for the Second Circuit distinguishes between a district attorney's prosecutorial and managerial duties in determining whether the district attorney is a municipal policymaker and thus if a municipality can be held liable under section 1983 for the district attorney's actions. "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir.1988). No municipal liability may arise from a district attorney's decision to prosecute. *See id.; see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) ("[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made."). "Where a district attorney acts as the manager of a district attorney's office, the district attorney acts as a county policymaker." *Walker*, 974 F.2d at 301.

In *Walker*, the court held that the City of New York could be held liable under section 1983 for failure to train its assistant district attorneys to turn over exculpatory evidence to the defense and to avoid use of perjured testimony. *Id.* at 300–01. Walker had been convicted based on police officers' and prosecutors' alleged coverup of exculpatory evidence and perjury, and imprisoned for nineteen years before he won his release by unearthing evidence that critically undermined the state's case against him. *Id.* at 294. He then brought suit under section 1983 against the City of New York, alleging that the City had failed to adequately train and supervise the assistant district attorneys to not suppress exculpatory evidence and that the City's failure to train constituted deliberate indifference to his constitutional rights, proximately causing his wrongful imprisonment. *Id.* at 295. *Walker's* extreme facts are distinguishable

from the case at bar where, at most, misjudgments rather than malice is suggested.

As a matter of policy it would be dangerous to charge the City with training district attorneys within the City of New York respecting their use of evidence at trials or their investigative practices. District attorneys are independently elected and must be kept free of municipal interference. One of their chief duties is to prosecute criminal conduct by local officials and to discourage corrupt municipalities.

E. *Notice of Claim under New York General Municipal Law*

 As a condition precedent to the commencement of an action against a municipality or any of its employees, a notice of claim must be filed within ninety days after the claim arises. N.Y. GEN. MUN. L. § 50–e(1)(a). Upon application, the supreme court or the county court in its discretion may extend the time to serve a notice of claim. N.Y. GEN. MUN. L. § 50–e(5) & (7). Although the statute provides that "[t]he extension shall not exceed the time limited for the commencement of an action by the claimant against the public corporation," N.Y. GEN. MUN. L. § 50–e(5), the New York Court of Appeals has interpreted the provision to require that an application be made "not more than one year and ninety days after the cause of action accrued, unless the statute has been tolled," *Pierson v. City of New York,* 56 N.Y.2d 950, 453 N.Y.S.2d 615, 439 N.E.2d 331, 332 (1982). Failure to comply with the notice of claim provision ordinarily requires dismissal. *Davidson v. Bronx Mun. Hosp.,* 64 N.Y.2d 59, 484 N.Y.S.2d 533, 473 N.E.2d 761, 762 (1984).

 The notice of claim requirement is not applicable to federal claims under section 1983. *See Felder v. Casey,* 487 U.S. 131, 138–40, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (expressing agreement with "th[e] near-unanimous conclusion" of the lower federal courts that state notice of claim provisions are inapplicable to section 1983 actions brought in federal courts and holding that such provisions are inapplicable to section 1983 actions brought in state courts); *see also, e.g., Day v. Moscow,* 955 F.2d 807, 814 (2d Cir.1992) (noting inapplicability of New York notice of claim requirements to section 1983 suits); *Ahern v. Neve,* 285 F.Supp.2d 317, 321 (E.D.N.Y. 2003) ("While the notice of claims requirement applies to state-based claims, it does not apply to actions brought pursuant to Section 1983."); *Mompoint v. City of New York,* 299 A.D.2d 527, 751 N.Y.S.2d 38, 39 (2d Dep't 2002) (concluding that failure to file a notice of claim does not require dismissal of federal civil rights claims under section 1983).

IV. *Application of Law to Facts*

A. *Police Officers*

1. *Individual Capacity*

a. *False Arrest and False Imprisonment*

 Wray's claims for false arrest and false imprisonment fail. As of the moment of the arrest, there was at least arguable probable cause for officer Weller and his fellow officers to arrest Wray. It was objectively reasonable for officers on the scene to believe that Wray was one of the robbers that they observed committing a crime and then attempting to escape. Alternatively, reasonably competent officers could at least disagree at to whether observation of the robbery under the circumstances sufficed for a reasonable person to believe that Wray committed the robbery. All the officers are entitled to qualified immunity for the false arrest and false imprisonment claims.

#### b. *Use of Suggestive Showup*

Wray arguably states a claim against officer Weller for use of an unconstitutionally impermissive showup, assuming that Weller performed the showup at which Williams identified Wray. He fails to state a claim against any other officer. The showups, by bringing identifying witnesses to view Wray in a jail cell at the station house, violated Wray's clearly established constitutional right not to be subjected to an unconstitutionally suggestive identification. The showup itself resulted in no damage to Wray. It was only the showup plus use in court that resulted in damage. The station house identification by Mitchell that officer Martorano arranged was excluded from the trial and thus resulted in no damage to Wray, whereas the one officer Weller allegedly arranged was admitted at trial.

■■■■ A question of fact remains as to whether it was objectively reasonable for officer Weller, if he was the one who arranged for Williams to observe Wray in a jail cell, to believe that he acted in a manner that was lawful at the time of the showup. Arguably, he was trying to make sure that he had not arrested the wrong person.

If any damages are found for the showup by officer Weller, they are likely to be nominal because such damage was not caused by the officer acting alone, but with the combined actions of the assistant district attorney and the trial judge, each of whom have immunity for their part in the constitutional violation.

It is unclear whether nominal damages would support the award of attorney's fees. John Caher, *Fee Award Rule Under Review by High Court*, N.Y.L.J., Oct. 12, 2004, at 1 (discussing question pending before the New York Court of Appeals as to whether "lawyers who win only nominal damages for their clients in fee-generating civil rights cases should generally not be entitled to attorney's fees").

#### c. *Malicious Prosecution*

■■■■ As for the malicious prosecution claim, there was at least arguable probable cause at the time of Wray's arrest. Williams' positive identification of Wray at the showup did nothing to weaken the assessment of whether there was cause for the arrest at the crime scene. Once officer Weller had arrested Williams and turned over the evidence to the assistant district attorney, the officer had no control over what evidence was to be used by the district attorney. The grand jury indicted and the petty jury convicted. Officer Weller is entitled to qualified immunity for the malicious prosecution claim. Although Wray alleges that officer Weller and other police personnel withheld from the district attorney's office information regarding the circumstances of the arrest and the improper showups, there is no evidence to support this claim.

#### d. *Failure to Intercede*

■■■■ Wray fails to state a claim against any police officer for failure to intercede to prevent an unlawful arrest or to prevent the unlawful showups. There was probable cause to arrest Wray and thus Wray's arrest did not constitute a violation of any constitutional right. As for the showups, Wray did not identify which police officers or supervisors, if any, knew of and thus would have had an opportunity to intercede to prevent the showups. Since Wray has been provided with a full opportunity to identify any such officers or supervisors through discovery, these claims are dismissed.

#### 2. *Official Capacity*

Wray's claims against the defendant police officers in their official capacity are

analyzed as if those claims were brought against the City of New York.

## B. *New York City Police Department*

Wray's claims against the New York City Police Department fail because it is an agency of the City of New York and therefore is not a suable entity.

## C. *City's Failure to Train*

### 1. *Police Officers*

■ The claim that the City failed to train and supervise police officers about appropriate identification procedures will probably fail at trial because Wray probably cannot establish "deliberate indifference" to the rights of citizens. The police are given general training regarding identification procedures and the need to prevent mistaken identifications. The circumstances of Wray's arrest were unusual in that the police officers witnessed the crime. It probably cannot be concluded that any policymaker knew or should have known that the police would be confronted with a situation where there is an issue as to whether a showup may be used to confirm the identification made by police officers who witnessed a crime first-hand. Nor has it been shown that there is a possibility of proving a history of police mishandling similar situations—i.e., impermissibly using a showup to confirm first-hand identifications made by police officers.

Nevertheless, in view of the strong statement of the Court of Appeals for the Second Circuit with respect to inadequate police activity, it is possible that the City's liability could be proved at trial. Without that strong statement, the case would be dismissed on the ground that the police had at least arguable probable cause to arrest and confirm their arrest by the police station showup.

### 2. *District Attorneys*

The decision of the Court of Appeals for the Second Circuit in *Walker* (see Part III.C.2., *supra*) is not applicable to this case. The facts of *Walker,* involving police coverup and *Brady* violations, were so egregious that, as already pointed out, it is limited to its facts.

Wray's claim against the City for failure to train assistant district attorneys is more accurately characterized as a challenge to the prosecutorial decision to use the showup evidence. Had the trial court excluded the evidence, the assistant district attorney would not have been able to use it at trial. Once the trial court at the *Wade* hearing permitted the introduction at trial of the showup evidence, the assistant district attorney could not, as a matter of law, have been forced to refrain from using it. There is no hint of any deliberate misleading of the state court or the state defense counsel by the assistant district attorney, or of any conspiracy between the police and the assistant district attorney.

■ Wray's claims with respect to the training and supervision of assistant district attorneys fail. Deliberate indifference cannot be established. There is no showing that there is the possibility of proving a history of assistant district attorneys mishandling evidence of a station house showup identification that followed an arrest based on the police witnessing the commission of a crime.

## D. *Notice of Claim under New York General Municipal Law*

■ The state trial court dismissed Wray's indictment on July 24, 2000 and Wray filed the requisite notice of claim on July 31, 2001——over a year after his claim arose. Wray failed to comply with the ninety-day deadline for filing. Nor did he file an application for leave to serve a late

308

notice within the one-year-and-ninety-day period during which a state court would have had the discretion to grant an extension. No basis for tolling exists. As of this date, well over four years since his claim arose, Wray is ineligible for an extension for the notice of claim and thus is barred from maintaining suit on his state law claims. State claims are dismissed. The notice of claim requirement does not, however, affect his claims under section 1983.

### V. *Interlocutory Appeal*

The dubious nature of conclusions denying full dismissal invites reversal. The court is of the opinion that its decision failing to dismiss the civil rights claim under section 1983 of title 42 of the United States Code based on a suggestive station house identification involves a controlling question of law as to which there is substantial ground for a difference of opinion; an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b). No stay is granted. *Id.*

### VI. *Conclusion*

Defendants' motion for summary judgment is granted except for the claim against officer Weller for use of an unconstitutionally suggestive identification and the claim against the City of New York for failure to properly train police personnel with respect to proper identification procedures. No basis for an injunction has been shown. An interlocutory appeal is desirable.

SO ORDERED.